ESTATE OF ERNEST A. OBERING, HELEN BAILEY OBERING, EXECUTRIX, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; HELEN BAILEY OBERING, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Obering v. Commissioner
Docket Nos. 7727-78, 4778-79.
United States Tax Court
T.C. Memo 1984-407; 1984 Tax Ct. Memo LEXIS 268; 48 T.C.M. (CCH) 733; T.C.M. (RIA) 84407; August 1, 1984. Stanley L. Drexler,Michael J. Abramovitz,Kathryn A. Tistinic, and Sam L. Leopold, for the petitioners. Mark H. Howard and Glen D. Wilkinson, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief Judge: In these consolidated cases respondent *269 determined deficiencies in Federal estate tax and in Federal gift taxes in the following amounts: Date or
Petitioner
Docket No.
Tax
Period Ended
Deficiency
Estate of Ernest
7727-78
Estate
1/23/75 [1]
$1,585,702.35
A. Obering
Helen B. Obering
4778-79
Gift
12/31/75
291,240.64
12/31/76
480,186.64
Subsequent to trial, respondent amended his answer to seek increases in deficiencies and additions to tax in the following amounts: Date or
Increased
Sec. 6653(a) [2]
Petitioner
Docket No.
Period Ended
Deficiency
Additions
Estate of Ernest
7727-78
1/23/75
$676,712.35
A. Obering
Helen B. Obering
4778-79
12/31/75
357,778.65
$32,450.96
12/31/76
1,886,280.77
118,323.37
After concessions by the parties, the issues remaining for decision are: *270 (1) what was the fair market value for certain shares of Warrior Oil Company: (a) that were owned by Ernest A. Obering at the time of his death, and (b) that were gifted by Helen B. Obering; and (2) whether the section 6653(a) additions to tax pertaining to the gift transfers should apply. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation and attached exhibits are incorporated herein by reference. [3]
Ernest and Helen Obering were husband and wife and maintained their residence *271 in Oklahoma City, Oklahoma. Ernest Obering (Ernest) died on July 23, 1974. Included in the assets of his estate were 45 shares of stock of Warrior Oil Company (WOC) representing 20 percent of WOC's 225 issued and outstanding shares. At all times herein pertinent the other owners of WOC stock were Helen B. Obering (Helen); Joseph and William Obering, who were Ernest and Helen's sons; and Alden Obering O'Brien, Helen and Ernest's daughter. Petitioner estate of Ernest A. Obering (the estate) elected to value the estate's assets as of the alternate valuation date of January 23, 1975. [4] The estate filed a Federal estate tax return on April 23, 1975, with the office of the District Director in Oklahoma City, Oklahoma. The 45 shares of WOC stock owned by the estate were distributed to Helen as beneficiary. Helen subsequently gifted a total of 15 shares of WOC stock to her three children on October 10, 1975. Fourteen months later, on December 22 and 23, 1976, Helen gave a total of 30 shares of WOC stock, divided equally, to two trusts for the benefit of her grandchildren. [5] A quarterly gift tax return for the period ended December 31, 1975 was filed *272 with the District Director in Oklahoma City, Oklahoma. A quarterly gift tax return for the period ended December 31, 1976, was filed with the Internal Revenue Service Center in Austin, Texas. Estate Tax Return
On its return, the estate listed and valued all of Ernest's assets, and ascribed a value of $221,201 to the 45 shares of WOC stock. This total was computed using a value of approximately $7,000 per share, less a 30 percent discount for minority interest. In his notice of deficiency respondent determined that the value of the 45 shares of WOC stock was $3,452,049, or $4,315,061, less a 20 percent discount in value for minority interest, marketability, and a stock restriction agreement. At the close of trial, respondent moved to file an amendment to his answer to conform the pleadings to the proof (the amendment). We granted his motion. In the amendment, respondent determined that the fair market value of the 45 shares of WOC stock was $4,606,875 (or $102,375 per share). [6] The parties agree to the value of the other assets of the estate. The sole issue, then, is what value should be ascribed the 45 shares *273 of WOC stock on January 23, 1975. 1. Warrior Oil Company
WOC was incorporated by Ernest in Colorado in the late 1940's to operate as a domestic oil and gas exploration and royalty company. WOC's headquarters are in Denver. In the 1950's and early 1960's, the company was a family business. Both Joseph and William Obering joined *274 their father's company immediately upon their graduation from the University of Oklahoma in 1956 and 1957, respectively. Each received an AB degree in geology. The three Oberings plus an engineer, Tony DePrimo, constituted WOC's management team. WOC had limited success through the middle 1960's, enough to provide an adequate living to its owners. Paul O'Brien, the husband of Alden Obering O'Brien, served as a director of WOC beginning in the late 1960's. Mr. O'Brien is also a geologist. As will be illustrated later, WOC's financial affairs became more complicated in the later 1960's, and in 1970, WOC hired a certified public accountant, Steven Stientjes. In the early 1970's, the Oberings and Messrs. O'Brien, Stientjes, and DePrimo constituted the entire management personnel of WOC. Don Todd and Larry Baker, like the Oberings, were operators of small, independent Rocky Mountain oil interests. Todd and Baker attempted to find other oil markets to develop and began discussions with the government of Indonesia, despite the fact that they had had no previous international experience. WOC and Carver-Dodge International Company (Carver-Dodge), a Delaware corporation that also has *275 its principal offices in Denver, were very interested in joining Todd and Baker in an Indonesian venture. However, the Sukarno government in Indonesia at that time was anti-western. Major oil companies were reluctant to develop the Indonesian market because of the threat of losing control of their operations. Following an abortive revolution in 1965-66, however, the Sukarno Government was replaced by the prowestern Suharto Government. WOC had studied the geology of Indonesia and decided to join the venture if the opportunity arose. (a) Indonesian Agreements
Todd and Baker formed the Independent Indonesian American Petroleum Company (IIAPCO) and in 1966 IIAPCO entered into a production sharing contract with P.N. Pertambangan Minjak Nasional, the national oil company of Indonesia. [7] Under the production sharing contract (which was scheduled to begin in January 1967) IIAPCO joined with Carver-Dodge and WOC to acquire for 30 years (subject to additional requirements) the exclusive rights to explore, develop and produce oil and gas in an initial area of 21,000 square miles offshore north and east of Jakarta and west of the island of Java (the Java contract). Originally, IIAPCO *276 owned 65 percent, Carver-Dodge 25 percent, and WOC 10 percent of the Java production sharing contract. In September 1968 a production sharing contract arranged under terms similar to those in the Java contract was executed between IIAPCO and Pertamina involving 51,000 square miles off the southeast coast of Sumatra (the Sumatra contract). Under the Sumatra contract IIAPCO paid Pertamina $1,000,000 and obligated itself to spend $22,500,000 over a 10-year period in exploration of (and if discovered, the production of) oil and gas. Under the Java contract, IIAPCO was required to expend approximately $7,500,000 over a six-year period. WOC organized the wholly-owned Warrior International Corporation (Warrior) to handle WOC's foreign operations. On the same day that IIAPCO entered into the *277 Sumatra contract, IIAPCO assigned an undivided 22.685 percent interest in the Sumatra contract to Carver-Dodge and also assigned an undivided 9.074 percent interest to Warrior. Warrior also held WOC's interest in the Java contract. These contracts were Warrior's sole assets. As of the valuation dates the stock interest in Warrior held by WOC was WOC's most significant asset. [8]
Seismic data had shown the Java area to be promising, but the Sumatra area was still considered at that time to be a wildcat or high risk venture. Previous to entering into the Sumatra contract, IIAPCO, Carver-Dodge and Warrior collectively had engaged in exploration. The first well was drilled in late 1968 and its success was confirmed in early 1969. [9] Since the three companies all lacked sufficient expertise in foreign offshore drilling and because Pertamina wished to speed development, they decided that a major oil company with an existing staff would be brought in to handle the operations. Sinclair Exploration Company (Sinclair) and Natomas International Corporation (Natomas) acquired an undivided 51 percent interest in the Java *278 contract [10] in exchange for Sinclair's and Natomas' promise to expend $4,000,000 of the next $5,000,000 in required expenditures. [11] Because 51 percent was relinquished, this meant the original three operators surrendered control over the venture. *279 Pursuant to the agreements between the participants, each year a budget denoting the coming year's operating expenses was required to be submitted by Sinclair for the Java project and by IIAPCO for the Sumatra project. [12] The participants were required to come up with an aliquot amount of cash on a monthly basis corresponding to their interests in the contract areas (sometimes referred to as cash calls). Failure to do so on time would cause a default. If the payment was not made within 30 days, a defaulting participant would subject its interest to forfeiture to the remaining participants, but without being relieved of any of its financial obligations (with a few exceptions). During the initial exploratory period WOC had sufficient funds to cover Warrior's share of costs. WOC later realized that it would need additional capital before oil sales would be sufficient to meet its share. WOC was unable to borrow on the security of the proven reserves in the contract areas because under Indonesian law all of *280 the reserves are owned by the Indonesian Government, not by the participants, and also because there was as yet no reliable production history. WOC therefore borrowed from its stockholders and later replaced that loan with a bank loan of approximately $2,000,000, which was guaranteed by the stockholders. WOC then attempted a public offering of its stock in early 1970. Due to a steep fall in Natomas' stock price and the depressed stock market in general at that time, WOC determined that the offering would not be successful. The attempt to have a public issue was then canceled. Needing cash to meet its obligations, in April 1971 WOC formed a Colorado partnership, Ramah Properties (Ramah) with Tidewater Marine (Tidewater), an oil service company in the business of providing offshore drilling rigs and support vessels. Tidewater had no experience specifically in the oil producing business. Under their agreement, Warrior contributed all of its Indonesian interests to Ramah. In exchange, Tidewater agreed to contribute $8 million, as required, to enable Ramah to meet its costs. Tidewater also loaned WOC $2.2 million, interest free, repayable only out of 50 percent of the production *281 income allocable to Warrior. With the loan proceeds, WOC retired its bank indebtedness that had been guaranteed by the individual shareholders. Once the $8 million from Tidewater was expended, all income and expenses were to be equally divided between Warrior and Tidewater. Until then, Warrior was entitled to receive all production income. The $8 million was expended by February 1973. By establishing Ramah, WOC (or actually, its subsidiary Warrior) in effect sold one-half of its Indonesian interests in exchange for $4 million plus an interest-free $2.2 million nonrecourse loan. The sole asset of Warrior was this 50 percent interest in Ramah, which in turn owned a 4.9 percent interest in the Java contract and a 7.5314 percent interest in the Sumatra contract. [13]
Under the Ramah partnership agreement, Warrior was the operating partner. Either partner's default would result in forfeiture of the partnership interest exclusive of existing wells in the Sumatra contract area. Near the beginning of operations, *282 the ownership of the two contract areas was as follows: Participants - Java
Percentage
ARCO (formerly Sinclair)
(Operator)
46.00
IIAPCO
36.80
Carver-Dodge
12.30
Ramah
4.90
Participants - Sumatra
Percentage
IIAPCO (Operator)
56.640
Carver-Dodge
18.829
Indomar
13.000
Ramah
* 7.531
Reading and Bates
4.000
Under both contracts, if oil was discovered in commercial quantities, the participants above would recover production costs out of and up to the first 40 percent of oil (cost oil). The remaining oil [14] was to be split 65 percent to Pertamina and 35 percent to the participants (equity oil). Therefore, the amount of equity oil available to participants other than Pertamina was 21 percent (60 percent times 35 percent). Under the terms of the production sharing contracts, Pertamina, on behalf of the Indonesian government, contributed the right to explore for the oil and gas in place, whereas the participants contributed *283 their expertise plus the costs of drilling and operating the wells. Thus, Pertamina was a "carried interest" in the venture. [15]
The 35 percent of equity oil belonging to the participants was subject to a further restriction. Oil sufficient to meet Indonesian domestic needs (if necessary) would be taken from this share and the contractors would be compensated at a rate of 20 cents per barrel over cost. Pertamina's share of the production (65 percent after cost oil) was to be marketed by the operators and the proceeds turned over to Pertamina. Of the oil that Warrior was entitled to take under the agreements, 40 percent of the oil was marketed by C. Itoh and Company, Ltd. (C. Itoh), a Japanese trading company, through an agreement arranged by Natomas. Japan was the principal market for the Sumatra oil because of its geographic proximity and the oil's *284 low sulphur content. C. Itoh also agreed, on an annual basis, to market the remaining 60 percent of Warrior's oil. Warrior lacked sufficient storage facilities or downstream processing capability to keep any of its allotment significantly beyond the time needed to sell and transport the oil. Oil prices increased through 1973. By 1974, however, the worldwide recession had caused a decrease in the amount of oil demanded. C. Itoh notified Warrior by April 1, 1975, that it would not renew its contract for marketing 60 percent of the oil and, although it would use best efforts, it would be unable to market all of the 40 percent as was required under their contract. At this point in time Warrior had no other sources of cash and was therefore forced into the "spot" market. [16] Ernest had died and Joseph and William Obering were inexperienced in marketing oil. After much trial and error, however, they were successful in their attempts and the sales were sufficient for Warrior to meet its monthly cash calls. *285 Marketing oil economically requires that a great amount be sold and shipped at one time (i.e., a tanker). Most purchasers, however, do not with to buy such a large amount in one transaction because of lack of storage space or for other reasons. The participants here, in order to sell oil economically, sometimes sold from the entire pool of extracted (lifted) oil a larger amount of oil than their allotment at any particular time. This practice is called overlifting. When some participants were in an overlifted position, other member(s) of the group (in this case it was usually Pertamina) would necessarily be underlifted. In 1974 and 1975, Warrior was significantly overlifted. [17]WOC's accounting treatment of its overlift was strongly contested by the parties in this case. *286 (b) WOC's Records
In recovering oil, the normal practice of the operators was to flare the accompanying natural gas at the well-head. [18] By early 1974, Pertamina informed the participants that this process would no longer be allowed. Pertamina required the participants to construct a natural gas plant. The plant was originally estimated to cost $77 million but actually cost approximately $218 million. Although the subsequent sales of gas were significant, the plant was never profitable. Warrior was informed from time to time of its share of the costs of building the plant and had to raise these funds largely by borrowing. An application by the operators to the Export-Import (Ex-Im) Bank for a loan of approximately $35 was approved in April 1974. Ramah's share of the loan was $1.7 million. Even though it was not normal practice, Warrior and Ramah were permitted to submit their unaudited financial statements in lieu of audited ones in order to qualify for the loan. *287 WOC's net book value [19] as of January 23, 1975, and October 10, 1975, was $6.9 million. On December 22, 1976, it was $7.7 million. Warrior's share of budgeted expenses in both contract areas were as follows: Fiscal Year Ended September 30
1972
1973
1974
1975
1976
1977
$1,370,678
$3,469,682
$5,674,173
$9,201,848
$7,680,870
$6,641,269
Net cash flow was computed as follows by Warrior on the basis of receipts over budgeted expenses (excluding sales of overlifted oil): Fiscal Year Ended September 30
1974
1975
1976
1977
$3,520,544
($58,000)
$1,428,000
$6,019,000
WOC was operated as a family business with no formal annual board of directors meetings after 1974. Annual meetings were deemed unnecessary because almost every board member was in contact with the other members each day. The remaining shareholder Helen was not consulted in the corporate decisions. [20]
As mentioned earlier, WOC did not have audited financial statements, *288 a not-uncommon practice among small, closely held companies. WOC's financial statements were kept on an income tax accounting basis to facilitate preparation of income tax returns. In submitting their records to the Ex-Im Bank for the gas plant loan, Mr. Stientjes, WOC's accountant, prepared statements in accordance with generally accepted accounting principles for the years 1971 through 1975. [21] Mr. Stientjes, however, was somewhat confused regarding what accounting theories should be employed in preparing WOC's statements. He consulted the financial records of public companies involved in the Java or Sumatra areas and discussed with Tidewater, Warrior's partner in Ramah, the accounting methods utilized by Tidewater. Stientjes attempted to prepare (as had Tidewater) WOC's statements according to the full cost carried interest accounting method. [22] During 1974 and 1975 these records were sent to the Ex-Im Bank, and also to a bank in Denver, which WOC used as its agent to finance collection of its oil sales. [23]
*289 In accounting for the carried party's interest, Warrior utilized the split-asset method. Respondent does not contest that this is an acceptable accounting method. For valuation purposes, however, respondent recomputed Warrior's financials (including depletion deductions) in accordance without the full recognition method. The parties also disagree as to how the overlift liability of Warrior should be reported in its accounting statements. In preparing its financials, Steintjes solicited the help of Robert Bennet, a partner in the tax division of the Denver office of Arthur Anderson and Company. The majority of Bennet's clients were in the oil and gas business. Bennet informed Steintjes that he had neglected to reflect Warrior's overlift position in WOC's accounting statements. Steintjes thereafter restated WOC's records for the year ended September 30, 1975. The amendment changed WOC's net income figure for that year from $2,401,236 to $631,346. [24]
*290 2. Stock Restriction Agreement
As WOC moved into the Indonesian market, Helen and her daughter were worried that there would be significant additional risk. Ernest and his sons were than concerned that fear of this risk might lead to shares of the company being sold outside the family and thereby threaten family management and control. A stock restriction agreement was entered into among the shareholders in May 1967. Pertinent portions of the agreement are as follows: STOCK RESTRICTION AGREEMENT THIS AGREEMENT, entered into by and among E.A. OBERING, HELEN B. OBERING, ALDEN OBERING O'BRIEN, JOSEPH B. OBERING and WILLIAM M. OBERING and WARRIOR OIL COMPANY, a Delaware Corporation (hereinafter referred to as the "Company"): RECITALS:
* * * 2. The parties to this agreement believe that it is to their mutual best interests to provide for continuity and harmony in management and the policies of the Company. 3. It is the mutual purpose of the parties to this Agreement to provide for the purchase by the Company and its stockholders (the term "stockholder" or "stockholders" as used herein shall refer to all persons now, or hereafter becoming, stockholders in the Company) *291 of any interest in the stock in the Company which any stockholder desires to dispose of during his lifetime and which any stockholder owns at his death. AGREEMENTS:
1. Restriction Upon Transfer of Shares.
No stockholder shall at any time sell, pledge, encumber, transfer or otherwise dispose of any or all of his shares in the Company, or any interest therein, nor shall any such shares or interest therein be subject to testamentary or intestate distribution, or be subject to disposition in or pursuant to proceedings of any nature except disposition to another stockholder, unless: * * * [after notice is provided to the company and remaining stockholders] the Company and the remaining stockholders do not elect to purchase such shares or interest as provided in subparagraphs 1(A) or 1(B) of this Agreement. A. Company's Election. Within thirty days after receipt of the Notice, the Company shall be entitled to elect to: (i) purchase all, but not less than all, of the shares in which a partial or entire interest is proposed to be sold, either at the price established under paragraph 2 of this Agreement or in the same manner and on the same terms set forth in the Notice; *292 or (ii) purchase any part of such shares in which a partial or entire interest is proposed to be sold, either at the price established under paragraph 2 of this Agreement or in the same manner and on the same terms as set forth in the Notice, provided that the remainder of such shares are purchased at the same price and in the same manner by the remaining stockholders as provided in the following subparagraph 1(B); B. Stockholders' Election.
(i) At such time as the Company elects pursuant to the preceding subparagraph 1(A)(ii) to purchase a portion of the shares in which a partial or entire interest is proposed to be sold, the remaining stockholders shall be entitled to elect to purchase the remainder of such shares at the same price and in the same manner as elected by the Company. (ii) If the Company does not elect to purchase all or any part of the shares or interest therein under subparagraph 1(A) of this Agreement, the remaining stockholders shall, within forty days after receipt of the Notice by the Company, be entitled to elect to purchase all, but not less than all, of such shares in which a partial or entire interest is proposed to be sold, either at the price *293 established under paragraph 2 of this Agreement or in the same manner and on the same terms set forth in the Notice.
(iii) * * * If any stockholder does not purchase his full proportionate share of such stock or interest therein, the balance shall be purchased by the other remaining stockholders in equal shares. No election by the remaining stockholders to purchase shares or an interest therein shall be effective unless the stockholders, acting by themselves or with the Company, elect to purchase all, but not less than all, of such shares or interest therein proposed to be sold. * * * 2. Determination of Price of Shares.
Unless and until changed as provided hereinafter, it is agreed that, for the purpose of determining the purchase price to be paid for the interest of a withdrawing stockholder, the value of each share of stock is as of the date of this agreement Six Thousand Two Hundred Dollars. This price has been agreed upon by the stockholders and the Company as representing the fair value of the interest of each stockholder, including his interest in the goodwill of the corporation. The stockholders and the Company agree to redetermine the value of the *294 shares of stock in the Company at the Annual Meeting of the stockholders in each year. The value so agreed upon shall be endorsed on Schedule A attached hereto and made a part of this Agreement, * * * * * * If the stockholders and the Company fail to make a redetermination of value for a particular year, the last previously stipulated value shall control.
* * * 4. Termination of Agreement.
This Agreement shall terminate upon the occurrence of any of the following events: (A) Dissolution, receivership or bankruptcy of the Company; (B) Upon unanimous agreement of all stockholders in the Company at such time to terminate this Agreement; or (C) When there survives only one stockholder a party to this Agreement. 5. Binding Effect.
* * * This Agreement shall be binding upon the stockholders, their heirs, legal representatives, successors or assigns, and upon the Company, its successors or assigns. This Agreement shall be governed by the laws of the State of Colorado notwithstanding the fact that one or more of the parties to this Agreement is now or may become a resident or citizen of a different state. SIGNED, this 24th day of May, 1967. [Emphasis *295 added.] The agreement conveys to WOC and the stockholders a right of first refusal to purchase for the amount of the tentative transfer price or for a price of $6,200 per share any interest that a stockholder wishes to dispose of during his or her lifetime or that is owned at time of the shareholder's death. A sale to another shareholder is excepted from the restrictions. The agreement provided for a redetermination of the stock price each year. If not redetermined, the last previously stipulated price would control. The $6,200 price set in 1967 was never changed. In 1978, the Colorado District Court in and for the City and County of Denver, in divorce proceedings concerning Joseph Obering and his wife, convened a hearing to determine what import the stock restriction agreement would have on the value of the shares of WOC stock for purposes of that proceeding. The court determined that the agreement was valid, was never repudiated or rescinded, and was binding and controlling in determining the value of the WOC shares for the property division in divorce (absent evidence of a greater market value among the other stockholders). Respondent here claims that we should disregard *296 this holding regarding the stock restriction agreement for estate valuation purposes because, inter alia, (1) the Colorado District Court erred in its determination and (2) the 1978 decision is irrelevant to the present question. [25]
3. Tender Offers
Some bona fide offers were made for all of Warrior's Sumatra interests. [26] In February 1973, Shell Oil Co., N.V. offered approximately $2,000,000 for each percentage point of Warrior's interest in the Sumatra contract area. [27] This offer was rejected *297 by Warrior. Shell thereafter sent an offer of up to $2,650,000 per percentage point of interest in Sumatra (the actual sale price was dependent upon production amounts). The Shell Oil offers never matured into a contract partly because of Shell's discovery that Warrior was obligated to market its share of reserves through C. Itoh Co. and also because WOC thought the price too low. By February 28, 1974, ARCO had made a $9,000,000 offer to WOC for all of Warrior's interest in Indonesia. [28]ARCO was mostly concerned with the Java project at that time since it was the operator of that area. Although carefully considered by WOC, the ARCO offer was never rejected or accepted, [29] and was not followed-up on by ARCO. As of January 25, 1975, the *298 offer was no longer open, partially because of contractual changes made by the Indonesian government that resulted in the production sharing contracts becoming less desirable. In April 1976, Hudson's Bay Oil and Gas Company Ltd. passed a resolution authorizing the acquisition of Carver-Dodge's then 8.66 percent interest in the Sumatra contract area [30] for a price not to exceed $19,730,000. [31] This put the price for Carver-Dodge's interest somewhere near what the Shell offer for Warrior's interest was on a percentage-of-the-production-contract basis, despite the then rapid fluctuation in the world-wide prices for oil and a possibility of seizure of all rights by the Indonesian government. *299 4. Seizure of Interests
Under Indonesian law, all of the assets employed in the drilling process (the rigs, the platform, and all equipment) become the property of Indonesia when they enter Indonesian waters. Similarly, the oil that is sold does not become the property of the respective participants until the tanker leaves Indonesian waters. Therefore the participants at no time have any right to the reserves in the ground or to any assets in Indonesia. There are two important characteristics of a contract right to production rather than a mineral interest in the reserves. Because there is no possibility of foreclosure, a production sharing interest has little or no potential for providing security to a lender for financing purposes. And, as a corollary to that fact, the participants are subject to the wishes of the Indonesian government because the government can, for all practical purposes, unilaterally alter the terms of the production sharing contracts. Because of significant financial problems, the Indonesian government, through Pertamina, did alter the provisions of the production sharing contracts in early 1975, retroactive in some respects to January 1, 1974. *300 Under this change, proceeds in excess of $5 per barrel were split 85 percent to Pertamina and 15 percent to the participants. Payment of an adjustment of several million dollars representing the change in allocation was due from Warrior in August 1976. In May 1976 respondent, in Rev. Rul. 76-215, 1976-1 C.B. 194, determined that as of June 30, 1976, the additional payment, as well as the share of oil production retained by Pertamina under the production sharing contracts, would no longer be eligible for the foreign tax credit. The effect of WOC's inability to claim this credit would significantly reduce its value. Respondent modified his position in Rev. Rul. 78-410, 1978-2 C.B. 348, stating that all pertinent amounts would be creditable for fiscal years ending before January 1, 1978. Because of these unilateral contract changes by Pertamina along with respondent's position on the creditability of the payments, new exploration in Indonesia lessened significantly. Gift Tax Returns and the Negligence Additions
In August 1974 after Ernest's death, Joe and William began assembling data in order to value the WOC stock. A shareholder's meeting was *301 called and the matter discussed. Helen Obering did not attend. The parties were in a quandary as to what was the value of the WOC stock. They were informed by their then counsel that the stock restriction agreement price of $6,200 was not determinative and that some attempts at valuation had to be made. They attempted to bring in a number of experts to value the shares, but found none that had the knowledge of the company and its history that they possessed. The concensus was that, owing to the hazards of operating in foreign markets during the recession, the troubles with cash flow and the threat of seizure, the company was worth very little. They concluded that the $6,200 figure was still reasonably accurate, but chose a slightly higher figure before applying a discount. Determining the value of the gifts of Helen's shares to her children and to trusts for her grandchildren was not as involved. The October 1975 figure was computed on the same value per share as was the estate value because the Obering brothers, on whom Helen relied, had concluded that the company's value had not changed much in the interim 10 months. To compensate for a perceived increase in WOC's value, *302 the December 1976 amount was chosen by adding 10 percent of the per share estate valuation figure. Respondent, on the other hand, originally determined that the value of the shares were as follows: Valuation
Fair Market
Shares of
Per Share
Date
Value
WOC Stock
Value
1/23/75
$3,452,049.00
45
$76,712
10/10/75
1,011,040.00
15
67,456
12/22/76
1,379,279.99
30
45,976
In an amended answer filed after the close of trial, respondent redetermined WOC's value. In those new figures, he asserts that conditions had sufficiently changed between January and October 1975 to support an increase in WOC's value in an amount 51 percent over his estimate of January 23, 1975. He also asserts that eleven months later there was a 67 percent increase in value (a 153 percent increase over his January 1975 figure). Respondent's per share values and total values of the estate and gifted stock are as follows: Valuation
Fair Market
Shares of
Per Share
Date
Value
WOC Stock
Value
1/23/75
$3,894,480
45
$86,544
10/10/75
1,961,445
15
130,763
12/22/76
6,566,250
30
218,875
Respondent therefore determined a full fair *303 market value for all of WOC as follows: [32]
Valuation Date
WOC Value
1/23/75
$19,471,400
10/10/75
29,421,675
12/22/76
49,246,875
However, no crucial events other than those provided above are listed by respondent to account for the vast changes he asserts. The redetermined figures result, therefore, mostly from respondent's reworking of WOC's financial statements. ULTIMATE FINDINGS OF FACT 1. The value of the 45 shares of Warrior stock in the decedent's estate on January 23, 1975, was $990,900. 2. The value of the 15 shares of Warrior stock gifted by Helen Bailey Obering on October 10, 1975, was $330,300. 3. The value of the 30 shares of Warrior stock gifted by Helen Bailey Obering on December 23, 1976, was $660,600. OPINION Once again we must *304 resolve a dispute over the fair market value of property, a process we have previously described as, at best, "weighing evidence of expert guesswork." Andrews v. Commissioner,T.C. Memo. 1976-106. The properties in question here are two separate minority interests in production sharing contracts for offshore drilling of oil wells in Indonesia. The interest in the partnership holding these contracts a the only assert of Warrior, the stock of which in turn constitutes the most significant asset of a closely held, family-controlled, domestic corporation. We must determine the value of the 20 percent minority interest in the latter corporation's stock. Valuation Criteria
To determine fair market value, the standard to be applied is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of all relevant facts. Secs. 20,2031-1(b), 25.2512-1, Estate and Gift Tax Regs.; Estate of Heckscher v. Commissioner,63 T.C. 485, 490 (1975). See McShain v. Commissioner,71 T.C. 998, 1004 (1979). The regulations *305 also prescribe specific rules for the valuation of stock based upon average prices for the stock when it is bought and sold on the open market. Secs. 20.2031-2, 25.2512-2, Estate and Gift Tax Regs. However, where (1) the stock is not traded on an established exchange, (2) there have been no recent sales of that stock or bona fide bid-and-asked prices, or (3) the stock to be valued is unique in many respects, we are left only with inexact and general guidelines. In such a situation, fair market value may be determined by an examination of numerous factors. These factors include net worth, past and prospective earnings records, dividend paying capacity, book value of the stock, the value of the underlying assets of the stock, the economic outlook in the particular industry, the company's position in that industry, management of the corporation, the control of the corporation provided by the block of stock to be valued, that block's size, the history and propects of the company, the values of securities of corporations engaged in same of similar lines of business which are listed on a stock exchange, and any other factor which would affect the price between a willing buyer and a *306 willing seller. Secs. 20.2031-2(f), 25.2512-2(f), Estate and Gift Tax Regs.; Riss v. Commissioner,56 T.C. 388, 432 (1971), supp. op. 57 T.C. 469 (1971), affd. sub. nom. 478 F.2d 731 (8th Cir. 1973), affd. cause remanded 478 F.2d 1160 (8th Cir. 1973); Estate of Leyman v. Commissioner,40 T.C. 100, 119 (1963), modified on other grounds, 344 F.2d 763 (6th Cir. 1965), vacated per curiam 383 U.S. 832 (1966). See Rev. Rul. 59-60, 1959-1 C.B. 237, modified by Rev. Rul. 65-193, 1965-2 C.B. 370, amplified by Rev. Rul. 77-287, 1977-2 C.B. 319. No single formula in applying these factors is controlling. O'Malley v. Ames,197 F.2d 256, 258 (8th Cir. 1952); Riss v. Commissioner,supra. And, because the issue is a factual one that may be resolved only through a weighing of all the evidence presented, the question is one of judgment rather than mathematics. Hamm v. Commissioner,325 F.2d 934, 940 (8th Cir. 1963), affirming a Memorandum Opinion of this Court. In order to aid us in our judgment, the *307 parties have presented us the opinions and testimony of six valuation experts. These experts employed different methods, factors, and the appropriate weight to be given each factor (which was usually dependent upon which party called for their testimony). Respondent offers figures separate from his experts. The result is, of course, a dispersed spectrum of values. We have stated many times that the valuation of property is an inexact science at best, capable of resolution by us only by a "Solomon-like" pronouncement, and therefore our preference is for compromise and settlement between the parties (who, after all, should be cognizant of all pertinent facts and able to employ superior expertise). Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 452 (1980); Estate of Heckscher v. Commissioner,supra;Messing v. Commissioner,48 T.C. 502, 512 (1967). See Akers v. Commissioner,T.C. Memo. 1984-208. Estate of Slutsky v. Commissioner,T.C. Memo. 1983-578; Strutz v. Commissioner,T.C. Memo. 1980-274; Farber v. Commissioner,T.C. Memo. 1974-155, affd. without *308 published opinion 535 F.2d 1241 (2d Cir. 1975); Estate of Cotchett v. Commissioner,T.C. Memo. 1974-31. We articulated our lament in Messing v. Commissioner,48 T.C. at 512, as follows: Too often in valuation disputes the parties have convinced themselves of the unalterable correctness of their positions and have consequently failed successfully to conclude settlement negotiations--a process clearly more conducive to the proper disposition of disputes such as this. This result is an overzealous effort, during the course of the ensuing litigation, to infuse a talismanic precision into an issue which should frankly be recognized as inherently imprecise and capable of resolution only by a Solomon-like pronouncement. In Buffalo Tool & Die Mfg. Co. v. Commissioner,supra, we stated: We are convinced that the valuation issue is capable of resolution by the parties themselves through an agreement which will reflect a compromise Solomon-like adjustment, thereby saving the expenditure of time, effort, and money by the parties and the Court--a process not likely to produce a better result. Indeed, each of the parties *309 should keep in mind that, in the final analysis, the Court may find the evidence of valuation by one of the parties sufficiently more convincing than that of the other party, so that the final result will produce a significant financial defeat for one or the other, rather than a middle-of-the-road compromise which we suspect each of the parties expects the Court to reach. If the parties insist on our valuing any or all of the assets, we will. We do not intend to avoid our responsibilities but instead seek to administer to them more efficiently--a factor which has become increasingly important in light of the constantly expanding workload of the Court. [74 T.C. at 452.] We must keep in mind that valuation is a question of fact, Duncan Industries, Inc. v. Commissioner,73 T.C. 266 (1979), and therefore is, by its very nature, an approximation derived from all the evidence. Helvering v. Safe Deposit Co.,316 U.S. 56 (1942). "[B]etter [to make] a fair guess than the one answer sure to be wrong." Bankers Trust Co. v. Higgins,136 F.2d 477, 479 (2d Cir. 1943). "Valuation is * * * necessarily an approximation." Silverman v. Commissioner,538 F.2d 927, 933 (2d Cir. 1976), *310 affirming a Memorandum Opinion of this Court. See Palmer v. Commissioner,523 F.2d 1308 (8th Cir. 1975), affg. 62 T.C. 684 (1974); Anderson v. Commissioner,250 F.2d 242 (5th Cir. 1957), affirming a Memorandum Opinion of this Court. Consequently, we have broad discretion to determine what methods and facts are most important in reaching a determination of value. [F]inding market value is, after all, something for judgment, experience, and reason on part of the trier, and does not lend itself to dissection and separate evaluation. [Colonial Fabrics v. Commissioner,202 F.2d 105, 107 (2d Cir. 1953), affirming a Memorandum Opinion of this Court.] Because many cases deal with items whose valuations are quite unique or complex, we have increasingly relied upon the parties' presentation of expert testimony as the basis for our determinations. See Estate of O'Connell v. Commissioner,640 F.2d 249 (9th Cir. 1981), affirming in part and reversing and remanding in part a Memorandum Opinion of this Court; Palmer v. Commissioner,supra;Estate of Piper v. Commissioner,72 T.C. 1062 (1979). *311 But while opinion evidence is relevant and admissible, it must be given its appropriate weight as is proper in light of the opinion maker's qualifications and in regard to all other evidence presented. Anderson v. Commissioner,supra.It is our prerogative, therefore, to embrace or reject expert testimony if, in our best judgment, such action is proper. Helvering v. National Grocery,304 U.S. 282 (1937); Silverman v. Commissioner,supra,538 F.2d at 933; Palmer v. Commissioner,supra,523 F.2d at 1310. [33] If we wish, we may choose the opinion of one expert at the expense of others. Buffalo Tool & Die Mfg. Co. v. Commissioner,supra.However, as stated in that case, we cannot abdicate our responsibility to determine fair market value. Where the nonprevailing party has clearly shown to our satisfaction a significant error in the expert testimony we find most persuasive, appropriate adjustments will be made. Moreover, in those situations where expert opinion is not sufficiently probative, we rely on other evidence or on the applicable burden of proof. With these general principles *312 in mind, we turn to the facts, evidence and expert opinions presented in these cases. Stock Restriction Agreement
Prior to an examination of WOC's value, petitioners' contentions regarding the stock restriction agreement must be resolved, for if we hold for petitioners on this issue, it would obviate the need to examine the expert testimony. Petitioners argue that the stock restriction agreement between the shareholders fixing the price at $6,200 determines fair market value for estate tax purposes. They base their contention on the facts that the agreement represents a bona fide business arrangement that was not a substitute for a testamentary disposition, the price was fixed, Ernest was not, for all practical purposes, free to dispose of the WOC stock at other than the option price during his life, the estate was obligated to dispose of the shares, and $6,200 per share is in fact the value of the stock. Respondent contends that the agreement was not a bona fide business arrangement, that it *313 was at best an attempt to artificially depress the value of the stock for valuation purposes (see sec. 20.2031-2(b), Estate Tax Regs.) and that, if there had been a business purpose at all in enacting the agreement, the purpose had been abandoned through the inaction of the parties. Hence, he argues, the agreement is unenforceable. We agree with respondent that the agreement is not determinative of WOC's value for estate or gift tax purposes because the terms of the agreement were insufficient to fix the value of the shares. In general, the fair market value of closely held stock may be established for estate tax purposes by an enforceable agreement that fixes the price at which a willing seller would part with his interest during his lifetime, provided his estate can receive only the price set per the agreement for the shares after his death. Estate of Bischoff v. Commissioner,69 T.C. 32 (1977); Estate of Littick v. Commissioner,31 T.C. 181 (1958); Estate of Salt v. Commissioner,17 T.C. 92, 98 (1951). See Lomb v. Sugden,82 F.2d 166 (2d Cir. 1936); Wilson v. Bowers,57 F.2d 682 (2d Cir. 1932). *314 The agreement must fully satisfy the above criteria in order to qualify. Only where the agreement represents a bona fide business arrangement, the price of the stock is fixed, the decedent was not free to dispose of the stock at other than a set price during his lifetime, and the estate is obligated to dispose of the shares (or they must be sold at the option of the purchaser) at a set price, will the agreement price prevail. See Estate of Reynolds v. Commissioner,55 T.C. 172, 188-189 (1970). Here, the stock restriction agreement provides that [no] stockholder shall at any time sell, pledge, encumber, transfer or otherwise dispose of any or all of his shares in the Company, or any interest therein, nor shall any such shares or interest therein be subject to testamentary or intestate distribution, or be subject to disposition in or pursuant to proceedings of any nature except disposition to another shareholder. * * * * [Emphasis applied.] Thus, the agreement does not foreclose the possibility of disposition of the stock at other than a set price by a decedent or his estate if the transferee were another shareholder. [34] Because the estate did not *315 have to sell the shares at the agreement's price, the latter is not determinative of value. Michigan Trust Co. v. Commissioner,27 B.T.A. 556 (1933).See Estate of Reynolds v. Commissioner,supra.Similarily, the restrictive stock agreement does not fix the value of the shares for gift tax purposes. Spitzer v. Commissioner,153 F.2d 967 (8th Cir. 1946), affirming a Memorandum Opinion of this Court; Krauss v. United States,140 F.2d 510 (5th Cir. 1944). See also Commissioner v. McCann,146 F.2d 385 (2d Cir. 1944), revg. 2d T.C. 702 (1943); Estate of Reynolds v. Commissioner,supra.
However, we do not agree with respondent's position that the stock restriction agreement is invalid and unenforceable, and that no weight should be give to it. Respondent claims that because the agreement specifically *316 provides for an annual reconsideration of the option price, it was not contemplated that the price of $6,200 per share would remain fixed. Accordingly, he asserts that the fact that the stockholders failed either to abide by the agreement's terms or to conclude that the $6,200 price in the agreement determined the estate or gift tax value is sufficient to prove an abandonment of the agreement by the parties, citing St. Louis County Bank v. United States,674 F.2d 1207 (8th Cir. 1982). Respondent further claims that the Colorado District Court's determination regarding the agreement's validity addressed only the 1977 taxable year (the year of the divorce proceedings) and was premised on the stockholders' "Waiver and Agreement" dated on or before December 21, 1976. See footnote 25, supra. Thus, respondent argues, the Colorado District Court's determination has no hearing on the agreement's validity concerning the valuation dates before us. Respondent further points out that the December 22 and 23, 1976 gifts from Helen were to three trusts for the benefit of her grandchildren. Since the recipients were not stockholders, the remaining stockholders had an election *317 under the agreement to obtain the stock from Helen for either zero consideration or $6,200 per share. The waiver of this right, respondent claims, shows that the agreement had been abandoned. We disagree. First, although the Colorado District Court's decision regarding the motion in limine on the viability of the agreement did refer to the December 1976 waiver by the stockholders as proof that the agreement was "adopted, ratified and confirmed fully," that Court's findings were not solely based on that fact. The Court further stated that the agreement was valid and binding to the extent of its application. It found that it was not repudiated, it was not rescinded and it was not ignored during the course of its existence. The Court's decision encompassed a period including the valuation dates herein. Respondent claims that this finding was clearly erroneous. We disagree. Our own evaluation of the agreement and the full record before us lead to the same conclusion. As of 1967, the Oberings had never attempted any business endeavor nearly as large as the Indonesian venture. If it failed, the venture would threaten the viability of WOC and the financial security of the whole *318 family. Knowing that the risks would be great, the agreement was intended to prevent the disposition of shares and possibly a shift of control of WOC to persons outside the family who might be adverse to risk. Because the Oberings wished to assure the continuity of WOC's management and policies, there was a valid business reason for the agreement. Estate of Bischoff v. Commissioner,supra,69 T.C. at 41; Estate of Reynolds v. Commissioner,supra,55 T.C. at 194. Compare Estate of Littick v. Commissioner,supra,31 T.C. at 187. We recognize that the existence of a valid business purpose has been held not to exclude the possibility that the agreement was a tax avoidance testamentary device. St. Louis County Bank v. United States,supra. However, we do not find such tax avoidance here. The agreement was signed in 1967 when the Oberings' business was relatively small, attempting to grow, and, while Ernest was of advanced age, there is no evidence that he was in ill health. See Estate of Littick v. Commissioner,supra,31 T.C. at 188. We also disagree with respondent's inferences *319 that the actual date of the signing of the agreement was 1976 or that the $6,200 per share figure were penned into the agreement much later than 1967. Our review of all the documents and testimony before us, including the testimony of the attorney who drafted the document, results in a conclusion refuting any such interpretation. Finally, we note that the nature of WOC's business had not changed from what was contemplated at the time the agreement was signed. Therefore, we do not have the same type of situation that concerned the Eighth Circuit in the St. Louis County Bank case. Also, in that case the District Court had concluded that the purchase agreement's price formula was determinative of value for estate tax purposes. The Circuit Court acknowledged that the agreement's price formula may in fact be more persuasive, but that the trier of fact in that case should not have limited its inquiry. Such is not our concern here, as we have already held that the agreement price for the WOC stock is not determinative of value. In the event that we should hold that the agreement was validly entered into in 1967, respondent further asserts that the fact that no subsequent revisions *320 were made to the option price constitutes a subsequent abandonment of the agreement. We disagree. While the language of the agreement does state that the value of the shares of WOC stock would be redetermined at each of the company's annual meetings, it also contemplated that such a redetermination might not occur, and it made allowances for that eventuality. The stockholders at all times acted as if the agreement were binding, evidenced by their granting a waiver in 1976. On this record we cannot say that the agreement was abandoned, and in our opinion it was enforceable at the time of the valuation dates herein. Although the agreement does not act to fix the value for tax purposes, it has been held that the existence of a stock purchase restriction agreement may have a depressant effect on the value of the securities subject to the agreement in both estate and gift tax situations. Worcester County Trust Co. v. Commissioner,134 F.2d 578 (1st Cir. 1943), revg. Estate of Smith v. Commissioner,46 B.T.A. 337 (1942); Estate of Raynolds v. Commissioner,supra. See Spitzer v. Commissioner,supra;Krauss v. United States,supra; *321 Kline v. Commissioner,44 B.T.A. 1052 (1941), affd. 130 F.2d 742 (3d Cir. 1942). See also Estate of Mundy v. Commissioner,T.C. Memo, 1976-395. However, none of respondent's experts nor respondent afforded any quantifiable weight to this factor, ostensibly because of their opinion regarding the agreement's unenforceabilty. We think this was incorrect. Regardless of what the ultimate resolution would be, a willing buyer knowing of the existence of purported restrictions would not disregard them and would attempt to make a corresponding adjustment in price. Estate of Reynolds v. Commissioner,supra,55 T.C. at 194. Such would certainly be the case here. We weigh the restrictions accordingly. Expert Valuations
Respondent had four experts to assist him in his valuation of Warrior's assets in Indonesia. Petitioner essentially used one expert to substantiate his claim but also solicited testimony from two others who were retained to critique the results and methods of respondent's experts. [35]
Mr. M. R. Anderson *322 appeared for respondent and originally determined the fair market value of Warrior's holdings in both contract areas in Indonesia as follows: Date
Total Value
Number of Shares
Per Share Value
1/23/75
$18,085,036
225
$80,379
10/10/75
17,220,963
225
76,538
12/22/76
10,660,301
225
47,379
Anderson's values were based upon the estimated reserves attributable to the Warrior holdings as a 50 percent partner in Ramah. These reserve figures were determined for the years in issue by reference to a report of Natomas (who, with or through IIAPCO, was the operator of the Sumatra contract area). Anderson claimed that the reserves for the area were as follows: (000's of barrels) 1972
1973
1974
1975
1976
TOTAL
393,951
507,544
359,631
422,530
351,220
Net to
11,559
14,239
10,334
12,756
10,660
Warrior
The estimates for the gross reserves from the Natomas report were listed as proved developed producing, proved developed nonproducing, and proved undeveloped. [36] The estimates also included reserves for gas and natural gas liquids, but these are generally assumed to balance the cost of the gas liquification *323 plant, and so were not involved in the calculations. Anderson took these reserve figures and multiplied Warrior's net by the following per barrel prices: Date
Price Per Barrel
1/23/75
$1.75
10/10/75
1.35
12/22/76
1.00
Mr. Anderson claims to have determined the price per barrel by reference to the Shell offer for the $1.75 figure and the sale of the Carver-Dodge interest for the $1.00 figure. He originally referred to the ARCO offer in 1974 to help establish a price per barrel figure. However, because, in Mr. Anderson's opinion, the ARCO offer reflected *324 so much lower a value than the Shell offer and was within nine months, he concluded the ARCO offer was not really bona fide if it covered both contract areas because it would have given "much too low a price." [37] Instead, he focused on the Carver-Dodge price of about $1.00 per barrel. [38] We do not agree with Anderson's valuation techniques as applied to the facts. *325 First, we disagree with the methodology of using a reserve valuation on the facts of this case. Unlike domestic exploration where the owner can have a fee interest in the minerals in place, no such legal right was present in Indonesia. In Indonesia, all oil is the property of the Indonesian government until lifted and out of Indonesian waters. Hence, no "right" to the reserves on behalf of the participants ever existed. All Warrior ever had was a contract right which could have been, and in fact was, altered at the will of the foreign country. The impact of this is underscored by the fact that Warrior was not able at certain times to use the reserves as security for loans because they were not the "owners" of the oil. In short, Warrior could be ousted from its interest at almost any time. We think a potentially willing buyer would buy Warrior's interest based on criteria other than those used by Anderson. A "straight" reserve analysis, without taking into account the above factors, is fatally flawed. Also, to have an accurate valuation, the estimated price per barrel to Warrior must also be accurate. Anderson did not demonstrate to our satisfaction that his prices were *326 adequate approximations. The volatile market at the time made price estimates exceedingly unreliable, and Anderson's discarding of the ARCO offer "because it was too low" in conjunction with evidence that other oil was selling at a much lower price underscores our lack of confidence in the reliability of Anderson's figures. [39] At trial Anderson admitted that the reserve figures identified as "Net to Warrior" were not in fact Warrior's net share of production, but instead were Warrior's cost share of production multiplied by the gross number of barrels. To get Warrior's net share one would have to reduce the gross figure by Pertamina's right to domestic production, which was not done. To apply the Carver-Dodge price to Warrior's interest on a price-per-barrel-of-reserve basis, one would also have to know Warrior's underlift or overlift position. Anderson testified he did not make any attempt to determine Warrior's overlift position in applying his analysis. *327 Respondent also presented the testimony of Mr. John Hyzer, vice-president in the area of corporate finance of a Dallas investment banking firm. Hyzer based his valuation on the nature of the business and its history, i.e., book value. Other factors were considered, but no mention was given as to what weight these other factors were afforded. He provided only oral testimony as to Warrior's value, using two separate approaches: (1) he adjusted Warrior's balance sheets to arrive at, in his estimation, a more accurate estimate of the net worth of the company; and (2) he did a comparison of price/earnings (sometimes referred to as P/E) ratios of the trading prices of publicly held companies possession Indonesian oil and gas interests and applied those ratios to Warrior's profits. In this way he arrived at the following total values for Warrior: Date
Amount
Per/Share
1/23/75
$20,430,000
$90,800
10/10/75
18,253,500
81,127
12/22/76
19,131,000
85,027
A 35 percent discount was then applied for lack of marketability and lack of control to arrive at the following per-share and total amounts: Discounted Value
Total Value [40]
Date
Per/Share
Times
of Shares
1/23/75
$59,020
45
$2,655,900
10/10/75
52,732
15
790,988
12/22/76
55,267
30
1,666,685
*328 In reaching his figures, Hyzer made four adjustments to WOC's balance sheets. Three adjustments were minor discounts to assets that he assumed could not be sold for fair market value in a liquidation. The other change was an upward adjustment of the value of the Indonesian oil and gas contracts to $18,085,306 from the balance sheet amount of $2,706,000. [41] The $18 million amount was Anderson's estimate of the correct figure. Hyzer did not independently check Anderson's conclusion as to what were the proper amounts of net reserves available to Warrior, nor did he have any idea as to what the correct price would be for a barrel of foreign oil at that time. Hyzer also did not understand the concept of a production company not "owning" the reserves it was developing, but testified if such were the case, the effect on the price of stock would be that "it would be worth a lot less." As for the comparison of price/earnings ratios, Hyzer compared five companies, *329 but used figures from only four. One of the companies lost money in one year and so had no P/E. The only criterion used in choosing a comparable company was the requirement that the company have an interest in Indonesian oil and gas properties. On cross-examination, Hyzer admitted that Warrior was almost totally dependent on its Indonesian operations while the four "comparable" companies were not. The other four had substantial activities beyond producing Indonesian oil and gas. After careful consideration of the above, we afford Hyzer's evaluation little weight. It is ultimately dependent on Anderson's estimates both as to price per barrel of oil and the reserve estimates to determine the production contracts' worth. Hyzer's book value estimate is therefore no more than a reiteration of Anderson's report and we think it suspect on those grounds. In addition, in examining Hyzer's application of P/E ratios, it does not appear that the companies chosen by him for comparison are in fact truly comparable. See discussion, infra.
Respondent also called Mr. Robert Smith, a revenue agent. Prior to becoming a revenue agent, Smith, a C.P.A., was a staff accountant for J.K. Lasser *330 and Co. and holds a Bachelor of Science degree with an emphasis in accounting. From 1974 through the present he has been involved in examinations of oil and gas companies. Smith addressed the problem of how Warrior treated its overlift liability on its financial reports. Smith changed Warrior's accumulated depletion, carried interest, deferred revenue, oil sales, depletion expense, and foreign tax expense accounts. The changes resulted in a revised figure for Warrior's net income for the fiscal year ended September 30, 1975 of $2,918,468, based on the unaudited general ledger accounts. However, the depletion expense was based on Anderson's report of Warrior's reserves as well as other production summaries; and the figures were calculated in a method consistent with Tidewater Marine's method. Steintjes, in preparing Warrior's overlift figure, took the entire overlift and reported it in the deferred revenue account. The method of treating the correspondent credits from this entry is where the accountants differ. [42] On cross-examination, Steintjes admitted that his treatment of allocations to deferred revenue, as well as its effect on the carried interest receivable account, *331 was incorrect. The error resulted in an increase to net income of $952,979 for the fiscal year 1975. [43] Smith's testimony encompassed only Steintjes's accounting treatment, and did not extend to an independent valuation of WOC. *332 Respondent's remaining expert, Mr. Ellis Evans, provides another basis for valuing WOC. Evans determined the following values for WOC as of the pertinent dates: Date
Value
Per Share Values
1/23/75
$7,722,000
$34,320
12/10/75
5,746,244
25,539
12/22/76
7,130,875
31,693
Because in Evans' view the initial values that were used were based upon comparative minority transactions in public markets, he concluded that there was no necessity to discount the above figures for a minority interest. The only discounts he thought appropriate were those representing "a cost of sale" or "marketing" cost. Based upon investment classifications of Standard and Poor's common stock quality ratings, flotation costs for lesser merit stocks warranted a range of 8.4 percent to 14.6 percent. Since WOC fell into that category, he allowed the average of that range (11.1 percent) as commission costs, plus 3 percent for legal, accounting and miscellaneous fees, or a 14.1 percent discount on the value of the estate shares. Thus, the per share value as of January 23, 1975, was estimated by Evans to equal $29,481, [44] or a total of $1,326,645 for the estate's shares. [45] A similar *333 method was asserted for the other transfers. [46]
The method Evans used was a comparison of WOC with publicly traded companies chosen by Evans as being in a similar line of business and affected uniformly by changes in the overall economic and political environment. See Rev. Rul. 59-60, supra. In selecting comparable companies, Evans testified he looked for those that were similarly affected by specific economic and political events. A final selection was, according to Evans, based on the following criteria: [47]
(1) The comparable companies' stock must have been publicly traded so that price quotations in a national publication were readily available. (2) The companies' financial reports must have been published by a leading financial service so as to allow easy access to financial data. (3) The companies' businesses should *334 have been such that investors would have regarded it as being in the same industry category as WOC. (4) The operating areas from which crude oil was obtained were subjected to similar probabilities of host country expropriation. In choosing his comparables, Evans compiled a universe of 75 businesses. He excluded those he deemed classifiable as major multinationals. Since, in the entire industry, Evans determined that there were no companies with equity return as high as Warrior's, he chose as comparable only those companies possessing the highest return on equity. Evans eventually settled on three companies for his comparative study: Natomas Company, Offshore Company, and Tesoro Petroleum Company. The comparison was a four-year weighted average of return on common equity encompassing the four prior years (1971-1974, inclusive). [48]Evans' work resulted in the *335 following figures: Net Income ($000's omitted)
Co/Date
1974
1973
1972
1971
Weighted Ave.
NATOMAS
$64,193
$11,199
$ 4,017
$ 957
$29,936
OFFSHORE
21,066
16,346
13,848
12,633
17,363
TESORO
64,704
19,874
13,047
7,672
35,220
WOC
2,798
673
504
76
1,430
The companies' year-end common equity was listed as follows: ($ 000's omitted) Co/Date
1974
1973
1972
1971
Weighted Ave.
NATOMAS
$213,369
$150,709
$138,371
$117,254
$169,960
OFFSHORE
95,543
74,464
58,118
48,831
76,563
TESORO
177,491
110,619
90,504
64,229
128,706
WOC
5,623
2,826
2,152
1,648
3,693
By looking at the weighted averages for net income and comparing them with the weighted averages for common equity, he arrived at four-year weighted averages for percentage return on equity. These worked out to be 17.6 percent for Natomas, 22.7 percent for Offshore, 27.4 percent for Tesoro, *336 but 38.7 percent for WOC. Taking the four year weighted average of net income and dividing it into the total equity of the three companies on January 23, 1975, the results are price/earnings ratios of 5.4, 6.6, and 4.2 for Natomas, Offshore, and Tesoro, respectively. The average P/E ratio was therefore 5.4. Multiplying that number by the weighted net income average results in the total value and per share valuations listed earlier. We think the Evans report is illuminating because it succeeds in employing concrete figures and quantitative analysis. The lure of the convenience of mathematical precision, however, must be shunned if the result is an erroneous or unrealistic valuation. We do not accept Evans' methodology as accurate for various reasons. First, we are not convinced that the four-year weighted average is appropriate in this case because it skews the results more toward 1974 net income, which had significantly changed from 1973 and may not have been truly reflective of Warrior's future earning capacity. Evans' report also ignores significant factors that would have a depressant effect on the value of the WOC stock. Last, and most importantly, we do not agree that *337 the comparable companies chosen by Evans are in reality truly comparable. Rev. Rul. 59-60, supra, sets out many criteria that should be considered when valuing closely held stock of nonpublic corporations. The ruling recognizes that averages or ratios may prove helpful in reaching a conclusion regarding value, but warns that "resort to arbitrary five-or-ten-year averages without regard to current trends or future prospects will not produce a realistic valuation." 1959-1 C.B. at 241. The trends that were at least somewhat ignored by Evans or not given appropriate weight were the impact of the Arab oil embargo and the worldwide recession, the continuous trouble with Rertamina and the threat of Indonesian seizure (or partial seizure) which, to a limited extent, occurred in the form of the unilateral renegotiation of the production sharing contracts, and the marketing problems. Other factors that we feel impacted on WOC's value that were not sufficiently addressed by Evans were the presence of a stock restriction agreement, some discount for minority interest above that inherent in the per share price of the comparable companies chosen by Evans, and the *338 lack of sufficient cash reserves or downstream capability by Warrior to meet its cash calls or to handle changes in its Indonesian operations. These latter factors are all absent from Evans' report. In our estimation, though, the report is not reliable because the choice of the three comparable companies was inaccurate. In reaching our decision we note that respondent's own experts contradict each other. Hyzer rejected Tesoro and Offshore as comparable companies. As mentioned earlier, Hyzer sued Natomas and five others. Evans, on the other hand, also rejected as comparable Hyzer's choices. Evans testified that he looked at five factors to determine comparability: return on equity, sales, reserves, integration and management. Yet, when applied to the companies he chose, none of the enumerated factors were really comparable among those companies. Evans conceded that Warrior's sales and reserves were "infinitesimal" compared to the subject companies'; that Warrior was not integrated at all while the other companies were; [49] and Warrior's return on equity was nowhere near the industry average. [50]
*339 Evans' focusing primarily upon return on equity, standing alone, is inherently flawed. As evidenced by the fact that Evans excluded five otherwise minimally comparable companies, return on equity can vary widely within the same industry. [51] Also, looking almost totally toward return on equity, as Evans has done (even among companies operating in Indonesia), provides no adequate opportunity for weighing other significant considerations in choosing a comparable company. We also can determine no correlation, on the facts of this case, between the return on equities and corresponding price-earnings ratios. The risk factors pointed out above might be reasons why Warrior might have a low P/E ratio and a high return on equity, while more secure and integrated companies, such as Natomas, might have a higher correlation. Even that conclusion is not necessarily true, as evidenced by the fact that in 1970 Natomas (probably on the weight *340 of its first Indonesian well) had a P/E ratio of 163 to 1 while in 1974 it had a ratio of 5.4 to 1. Such a rapid swing undermines any confidence in the conclusions Evans asserts. Because the comparisons drawn by Evans were not truly reflective of conditions at that time, [52] we decline to accept Evans' report as determinative of WOC's value. Independent of the valuations of the experts called by respondent, respondent asserts a separate valuation. This valuation, which respondent used to arrive at the increases and additions to tax contained in respondent's amendment to answer to conform the pleadings to the proof, utilized an adjusted net worth method and a market comparison method on each of the valuation dates in question. The estate tax value as computed by *341 respondent's method was set out in the findings of fact (see footnote 6, supra), and the computations for the gift tax transfers are set out in the margin. [53] *342 The differences between petitioners' and respondent's figures are traceable, under the net worth method, to respondent's valuation of the Warrior production sharing contracts in excess of $40 million over petitioners' value. This change increased total assets in a corresponding amount, which in turn was reflected in an adjustment to net worth. Respondent's reformulation was based upon his recreating new WOC balance sheets for *343 the years 1974 through 1976 based upon reports or documents furnished to third parties. Respondent nevertheless also requests that we determine that the market comparison method is the correct method for determining WOC's value under the facts of this case. Under that method, respondent recomputed WOC's earnings as of September 30, 1975 and 1976 (the close of WOC's fiscal year) using the full recognition method of accounting for the carried party interest rather than the split-asset approach, and applying that method of accounting to figures he asserts are derivable from documents furnished to third parties. The earnings are then multiplied by price/earnings multiples in excess of 6 to reach the full WOC value on each of the pertinent dates. We do not agree that respondent's methodology (either the price earnings multiples, adjusted net worth, or the average of the two) is the most accurate procedure for determining fair market value as applied to the facts of this case. The earnings that respondent utilized in his computations are not from complete financial documents that were submitted to third parties. To obtain the numbers respondent used, he made a number of assumptions *344 that we do not think are fully warranted. Included in these is respondent's recomputation of WOC's earnings based upon the full recognition approach. WOC consistently reported its income using the split-asset method, and we see no compelling reason to use different method to meet our present objective of determining fair market value. In addition, the mere fact that the figures may be so easily and drastically altered by manipulation of the accounting treatment employed, resulting in a corresponding change in WOC's valuation, supports our determination that a valuation based upon price-earnings multiples is not the best method available. We also do not accept respondent's choice of such a high P/E multiple. Moreover, respondent offers no sufficient explanation to the fact that the experts he called offered valuations starkly different from his own. The table below sets out those estimates as follows: WOC Value (total)
Date
Anderson *
Hyzer
Evans
Respondent
1/23/75
$18,085,036
$13,279,500
$7,722,000
$19,472,400
10/10/75
17,220,963
11,864,700
5,746,244
29,421,675
12/22/76
10,660,301
12,435,075
7,130,875
49,246,875
WOC Value (per share)
Date
Anderson
Hyzer
Evans
Respondent **
1/23/75
$80,379
$59,020
$34,320
$ 86,544
10/10/75
76,538
52,732
25,539
130,763
12/22/76
47,379
55,267
31,693
218,000
*345 Anderson's figures show a quickly decreasing value in Warrior's only assets, the production sharing contracts. Yet at the same time, Hyzer's and Evans' figures show a slight decrease in value, then an increase to roughly the same figure as was given for the estate tax value. Respondent, though, shows a doubling of value during the same period. While it is true that Evans used the WOC financial statements originally submitted to respondent, Anderson and Hyzer did not (they substituted a value for the production sharing contracts based upon a reserve analysis). Evans' report also used a much lower price-earnings multiple than respondent's. We can see no way to reconcile these reports that show WOC's value either sharply decreasing, mildly fluctuating, or greatly increasing over the same period of time. [54] We think this contradictory testimony demonstrates the unreliability of the valuations of respondent and of those experts called by him. *346 Petitioner's expert, R. Kenneth Merkey, established his valuation of WOC by reference to all the factors listed in Rev. Rul. 59-60, supra.[55] Merkey provided two separate valuations. The first estimates WOC's market value as of January 23, 1975. The second is a supplemental appraisal addressing the value of minority interests in WOC as of the dates of the gifts. In short, the gift report states that any changes in those conditions were not sufficient to alter the value of the gifted shares from the value they had for estate tax purposes. The estate tax report itemizes the difficulties of establishing a value and what factors were used in compiling his valuation. Essentially, Merkey was the only expert *347 to examine every factor listed in Rev. Rul. 59-60, supra. He offered his general opinion as to how each factor impacted on WOC's value. He concluded that the time period around January 1975 was a most inopportune time to value the shares because oil markets were in a depressed state of affairs and "the market for a 20 percent interest in Warrior was probably the smallest imaginable, if it existed at all." He stated that because of the risky Indonesian market, the capital intensive nature of the oil industry, and the presence of much more attractive and safer investments at the time (the Alaska North Slope, for example) a prospective buyer of WOC would place little weight on WOC's net income or P/E ratios. In his estimation, a prospective buyer would also give little weight to net asset value or book value in light of the fact that Warrior's only asset was a production sharing contract and not the reserves themselves, and because WOC did not have audited financial statements. As such, WOC's net worth would have to be computed on historical factors alone. Book value also would not show contingent liabilities such as WOC budget commitments in Indonesia and marketing *348 arrangements for its oil. Accordingly, Merkey put little emphasis here on book value. After mentioning all of the above factors, Merkey summarized his findings in a general manner and affixed the value of one estate share within "a price range of $5,000 to $10,000 per share * * * with the average trade probably being near the $6,000 per share figure." Even though Merkey's report addressed all the relevant factors set out in Rev. Rul. 59-60, supra, we afford it little overall weight. Nowhere in the report does Merkey attempt to quantify any of the factors he touches upon, nor does he explain what amount of weight he placed on each in reaching his determination. While his assessment of the individual factors was generally acceptable, that alone, without so much as an attempt to bridge those findings to some quantifiable standard, renders his estimates unsupportable. As it appears in his report, his summation of the discounts and what valuation methods should be used is only a vague "gut feeling" of what WOC is worth based upon his familiarity in that particular area. That is not sufficient. We note, though, that the report's listed factors were probative of WOC's *349 value. Petitioners retained another expert, Mr. Robert A. Stanger, to evaluate the methods employed by respondent's experts and to note the inadequacies and inaccuracies that might be contained therein. Stanger personally signed the report and stated he was its ultimate preparer, but a significant portion of it was drafted by an employee, G. Furman Nettles. Both Stanger and Nettles testified at trial. We consider Nettles and Stanger's testimony essentially the same. [56]
Stanger concludes that a prospective buyer of a small corporate interest whose only assets were the listed production sharing contracts would care little about what the net income of the company was and would instead focus on cash flow. This is because net cash flow would indicate the speed with which a purchaser would recover its investment. We conclude that while Stanger's cash flow analysis has appeal, it is not the best method available to us to value the WOC shares. Although Stanger's intent was merely to attack the opinions of respondent's experts, he did prepare a draft evaluation of Warrior's *350 Indonesian interests. In an appendix attached to the report, Stanger calculated a value for the estate and gift shares using a percentage-point-of-the-production-contract method. [57] The price set for each percentage point was obtained by dividing the sale price of Carver-Dodge's interest to Hudson's Bay Oil by Carver-Dodge's percentage interest. He calculated the resulting values as follows: Southeast Sumatra
3.4276%
Northwest Java
2.4500
5.8776% times $1,500,000 (Carver-Dodge's Sale Price)
Total Value
$8,816,400
Divided by 225 shares
= $39,184
Valuation Date
1/23/75
10/10/75
12/22/76
Per Share Value
$39,184
$39,184
$39,184
Less 30% Discount
11,755
11,755
11,755
27,429
27,429
27,429
Less 14.1, 10.1,
10.6%, respectively
3,867
2,770
2,907
23,562
24,659
24,522
Less 50% Discount
11,781
12,329
12,261
Value
$11,781
$12,330
$12,261
The various discounts and reductions will be discussed presently, but, in general, we think this to be the most accurate approach taken. *351 As indicated earlier, the best evidence of a stock's value are contemporaneous sales of that stock. Lacking that, contemporaneous offers are also quite valuable provided that conditions between the time of the offer and the valuation date are unchanged or not so different so as to render the price incapable of reliable adjustment. Neither party used the Shell and ARCO offers or the Carver-Dodge sale, as is, as determinative of Warrior's value. We think petitioners did not want to rely on the offers or sale because they would tend to establish a price for the stock significantly in excess of what they proposed. [58] On the other hand, respondent's experts put great emphasis on the Shell offer, but not in the manner in which the offer was structured. Instead, they used it as a basis upon which to reach a price-per-barrel approximation based upon Natomas' reserve estimates, and multiplied it by what were determined were the reserves allocable to Warrior. This would tend to establish a higher value for the shares. Despite the *352 parties' recalcitrance, we see no reason why the Carver-Dodge sale, as is, does not serve as a good focal point. Such a price reflects a buyer's consideration of the major price-depressant factors that the petitioners point out. These factors include that threat of Indonesian expropriation or production contract changes, the difficulties of working and drilling offshore in the Third World, the changing mix and bureaucracy of the Indonesian government, the marketing problems of the oil industry in 1976 (including better sources of oil in the North Slope of Alaska and the North Sea, etc.), and the financial cash flow problems that Warrior found so difficult. On respondent's side, the problem of the inaccuracy of WOC's financials or of determining the company's correct income, cash flow, etc., are no longer relevant. Presumably Hudson's Bay was quite aware of all the above factors through Carver-Dodge's financial records and knew what income would be generated from participation in the contract areas when it agreed to approve up to $23 million for the sale. Looking to the Carver-Dodge sale on a percentage point-of-the-production-contract basis as the crucial fact in out analysis *353 is also preferred because of the particular facts of this case. Warrior's only assets were its shares of the production sharing contracts in the Java and Sumatra areas. The value difference between the two areas is not very significant. Accordingly, if we assume equivalency between Java and Sumatra, the Carver-Dodge deal represents a sale of assets identical to WOC's. Appropriate discounts may then be applied thereafter for such differences as a sale of stock versus a sale of assets, minority interest, and the stock restriction agreement. The other methods urged upon us by various experts are necessarily based on assumptions that are, in out opinion, questionable. While we think the percentage-point-of-the-production-contract estimations contained in Stanger's report are the best evidence regarding value, we do not end our inquiry there. Evidence presented by respondent clearly demonstrates errors in that valuation. First, Stanger has placed Warrior's interest (one-half of Ramah's share) in the Sumatra contract area at 3.4276 percent, where the parties have stipulated that it actually was 3.7657 percent. When added to the Java contract area's percentage (2.45), Warrior held *354 6.2157 percent, not the 5.8776 percent that Stanger listed. This "mathematical" difference is an obvious error from what the correct result should have been. Second, it appears that some of Stanger's computations were made prior to verification of all the facts. At one time it was though the Carver-Dodge sale price was $13 million for the 8.66 percent interest (which roughly corresponds to a price equal to $1.5 million per percentage point). As stated earlier, the actual price was $23 million, less $3,277,000 allocated for payment of Carver-Dodge's overlift liability. Thus, to establish a base price for the assets, a proper approximate sale price from the deal should have been $19,723,000 ($23 million - $3,277,000) or nearly $2.3 million per percentage point. Last, the three discounts merit some examination. In our opinion, the appropriate discounts should be: the difference between a purchase of a shareholder interest in a small, family controlled corporation rather than the rights to oil; that that interest would be a minority interest; the existence of a stock restriction agreement; and the difficulty associated with Warrior's marketing agreement with C. Itoh. We think *355 these discounts are embodied in the percentage discounts that Stanger listed and such discounts are reasonable, with one exception. The evidence demonstrates that the 14.1, 10.1, and 10.6 percent discounts (on each of the respective dates) were taken only because Evans allowed them in his report. Stanger's first discount of 30 percent for "marketing costs, would, in our opinion, include the same costs that Evans made allowance for. To allow them again would constitute double discounting, and thus would be erroneous. We therefore strike those discounts allowed by Evans in his report from the Stanger computations. Thus, the computation of the value of Warrior stock is as follows: Southeast Sumatra
3.7657
Northwest Java
2.4500
6.2157 times $2,277,483 [59]
Total Value
$14,155,851
Divided by 225 shares =
$62,914 per share
Per Share Value
$62,914
Less 30 percent discount
18,874
44,040
Less 50 percent discount
$22,020
$22,020
Thus, we determine the value of the 45 estate shares to have been $990,900. The value of 15 shares gifted October 10, 1975 is $330,300. The value of 30 shares gifted December 23, 1976 is $660,600. [60]
*356 Negligence Additions
Respondent determined section 6653(a) negligence additions to tax for intentional disregard of rules and regulations for both of the gift tax returns, but not for the estate tax return. The additions were claimed in amended answers. Respondent bears the burden of proof on this issue. Rule 142(a). We hold he has failed to meet his burden. Respondent's assertions are based upon unsubstantiated alleged facts and his belief that it is "inconceivable" that petitioner Helen Bailey Obering could believe WOC's value did not exceed $500,000 [61] in light of Warrior's excessive "contributions" [62] to the production contract. We disagree. Respondent argues that gross receipts from oil sales, when applied to meet Warrior's cash calls, are the equivalent of "contributions" from the company to its own equity. We see no such correlation. Respondent also accuses Steintjes and Warrior's executives of deliberate efforts to mislead the government in the submission of WOC's financials. Since petitioner Helen Bailey Obering was not involved at all in Warrior's operations other than as a shareholder, it is not clear what impact this fact, even if proved, should have. *357 It appears that the only rule or regulation that petitioner Helen Bailey Obering may have disregarded was her responsibility to report the fair market value of the gifted property. Because of all the differences of opinion we have painstakingly discussed herein, and the facts of this case, we do not find that she was negligent or intentionally disregarded respondent's rules or regulations. On this record we conclude that respondent has not met his burden of proof, and we hold that Helen Bailey Obering is not liable for such additions to tax. To reflect the conclusions reached herein, Decisions will be entered under Rule 155.
Footnotes
1. Ernest A. Obering died July 23, 1974. His estate elected to value the estate assets as of the alternate valuation date of January 23, 1975. See footnote 4, infra,↩ and accompanying text.
2. Unless otherwise indicated, all references to sections are the Internal Revenue Code of 1954 as amended and in effect during the years in issue.↩
3. Although the parties presented the unaudited financial statements of Warrior Oil Company and its wholly-owned subsidiary, Warrior International Corporation, as joint exhibits, respondent reserved the right to contest their accuracy (as well as the accuracy of any other exhibits based upon the financial statements). The accuracy of these financial statements was contested at trial and remains in dispute. We think it unnecessary, however, to reconstruct Warrior Oil Company's financial statements in their entirety. Where relevant, the numbers we have utilized represent our determination of the correct figures. Attendant explanations will accompany the figures as necessary.↩
4. See section 2032(a)(2).↩
5. We will use December 23, 1976, as the valuation date.↩
6. Respondent arrived at the number in the following manner: Adjusted Net Worth Method
$42,550,444
Market Comparison Method
28,324,640
(Average of above methods)
35,437,542
Number of WOC shares outstanding
225
Value per share
157,500
Number of shares in gross estate
45
Value of estate shares pre-discount
7,087,500
Less: 35% discount
2,480,625
FAIR MARKET VALUE
$ 4,606,875
Therefore, petitioner's full fair market value for WOC before discount as stated on the return was approximately $1,575,000, ($7,000 per share times 225 shares) while respondent's amended value was somewhat more than that (22.5 times) at $35,437,542. On brief, respondent asserts that the January 1975 fair market value of 45 WOC shares is $3,894,490. We will, therefore, hereinafter use the latter figure as respondent's amended value.↩
7. Prior to September 1968 that company was replaced by P.N. Pertambangan Minjak Dan Gas Bumi Nasional (Pertamina), the Indonesian state oil and gas agency responsible for all of Indonesia's oil and gas operations. For the sake of convenience, all subsequent references to Pertamina shall be deemed to include its predecessor or the interests of the Government of Indonesia, where appropriate.↩
8. The parties agree as to the value of WOC's remaining assets.↩
9. To offset some of the exploration costs, as well as distribute the risk, the three participants reformed their agreement in October 1969 to form a general partnership called SOUEX. IIAPCO, Carver-Dodge and Warrior all contributed their interests in the Sumatra contract area in exchange for the following partnership interests in SOUEX: Partner
Percent
IIAPCO
59.0000
Carver-Dodge
19.6131
Indomar
13.5417
Warrior
7.8452
Indomar was a limited partnership which expended $8,750,000 for its percentage interest in SOUEX. SOUEX in turn paid the $8,750,000 to Reading and Bates, a drilling firm. In addition to the cash, Reading and Bates received a 4 percent undivided interest in the Sumatra contract while SOUEX retained 96 percent. ↩
10. The search for investment partners was difficult because of the high risks in finding oil and gas in commercial quantities and in relying on the as-yet untried Indonesian Government. Sinclair's portion of the contract was 46 percent, while Natomas received 5 percent. ↩
11. Once oil was found in commercial quantities, Sinclair agreed to advance up to a maximum of $9,000,000 in development operations for exploratory drilling areas.↩
12. Because Warrior held only a minority interest in each of the two areas, its input as to how much or where drilling should be done amounted to merely a suggestion.↩
13. The percentage interests do not match with the SOUEX percentage (see footnote 9, supra↩) because of the inclusion of Reading and Bates into the Sumatra contract area.
*. Rounded from 7.5314 percent↩
14. If costs exceeded 40 percent of oil produced on an annual basis, the excess costs were to be carried over to the following year and offset against 40 percent of that year's production.↩
15. A carried interest occurs where one holder of a working interest in a venture agrees to advance development costs on behalf of the others and recover those advances from future production accruing to the other owner's share of the working interest. See Breeding and Burton, Taxation of Oil and Gas,↩ sec. 2.08 (1961).
16. The "spot" market refers to a secondary system enabling specific one time purchases of oil in various amounts as opposed to selling a fixed amount of oil under a continuing contract at a set price. The "spot" market is very sensitive to worldwide price and quantity changes.↩
17. By late 1976 Ramah had returned to a slight underlift position, while ARCO and Natomas were overlifted in excess of 3.3 million barrels. Pertamina was underlifted in excess of 4 million barrels. At this point Pertamina stated it would begin to take more than its share under the contract agreements. This had the portent of limiting the other participants' share of oil. In late 1976 ARCO informed Ramah that Ramah would have to take its monthly share each month or lose its allotment (exclusive of the rules of the operating agreement). Ramsh's small allotment would be impossible to move on a practical level unless Ramah could combine its sales with another operator who had access to tanker capacity. This underscored WOC's great difficulties in marketing its oil.↩
18. The natural gas pockets found in association with oil deposits provide the pressure to lift the oil through the well. When the gas is significantly depleted or exhausted, the remaining oil can be recovered only through secondary or tertiary processes.↩
19. Net book value is excess of assets over liabilities.↩
20. Alden Obering O'Brien was presumably kept informed of the corporate affairs through her husband, Paul.↩
21. The unaudited financials of Warrior submitted to the Ex-Im Bank conflict with other documents as to the amount of net income Warrior recognized for taxable years previous to those in question. Warrior was on a September 30th fiscal year. Respondent contests the 1974 net income figure because 1974 was the last full taxable year prior to the first valuation date of January 23, 1975. The Warrior net income for the fiscal year ending September 30, 1974, as provided to the Ex-Im Bank was based on estimates from 6-month and 9-month periods. The net income figure Warrior submitted to the Ex-Im Bank for the fiscal year ended September 30, 1975, coincided with that originally provided respondent. ↩
22. There are two accounting methods to report a carried interest. The first is the split-asset method of accounting. Using the facts of this case, this method would treat the 35 percent working interest and the 65 percent carried interest repayable out of 26 percent of the oil (65 percent of 40 percent cost oil) as two separate properties. Under the split asset method, the 35 percent interest would include only 35 percent of the total revenue and charge against that income (1) 35 percent of expenses and depreciation on investment, (2) unit-of-production depletion on 35 percent of the leasehold interest (including all unreimbursable costs) and (3) 35 percent intangible drilling costs. The remaining costs are carried in a fashion similar to an account receivable, though it is not listed as such. Income from 26 percent of the oil is credited directly to the carried interest account. The net result is that none of the carried interest party's income or expenses is recognized in determining the operator's income. The other method is the full recognition method. This treats both the working and carried interests as one property. One hundred percent of the costs of the entire interest would be deducted over the life of the equipment or the reserves. The income would be the total from both the working and carried interests and all expenses applicable would relate to that same total. All costs are capitalized when incurred and are amortized over the reserves as the oil is produced (unit-of-production method). An example of the differences between the two methods based upon this case's production contracts is: ↩
Full Recognition
Split Asset
Classification
Approach
Approach
Total Revenue
$100
$35
Expenses
40
14 (35% of 40)
Net Income
$ 60
$21
23. Warrior would sell the oil and then borrow the amount of the expected payment (less the financing premium) from the Denver bank using the purchaser's promise as collateral. The purchaser was instructed to pay the bank directly.↩
24. Steintjes sent copies of the amended figures to respondent. At trial, however, it became apparent that an error in this treatment existed. The net income of the restated financials should have included an additional amount of $952,980. The reports of some of the expert witnesses were based in part upon the earlier incorrect restated figure.↩
25. Because the recipients of the October 15, 1975, transfers were other shareholders, the agreement's provision did not apply. The agreement's restrictions were waived by the other stockholders for Helen's December 1976 transfers to the trusts. Respondent further claims that the remaining shareholder's passing up on the opportunity to acquire the 30 shares for the $6,200 price or for $0 (what would be the transfer price in the case of a gift) proves that the agreement lacked any vitality. Petitioners claim that such a waiver did not serve to invalidate the agreement, but in fact showed its continuing vitality because the stockholders followed the agreement's terms.↩
26. On many occasions other possible sales and deals were discussed but most of these did not approach the status of valid offers. ↩
27. The parties do not elaborate on how the interest was to be conveyed in light of the fact that Ramah was the technical owner of the production sharing interest. It is clear, however, that the offer addressed Warrior's distributive share of the Sumatra contract area (one-half of Ramah's interest, or 3.7657 percent).↩
28. Respondent claims that the entire $9,000,000 was offered for Warrior's rights in the Java contract only (i.e., one-half of Ramah's, or 2.45 percent) or $3,857,143 per percentage point. See discussion, infra.↩
29. It was not known how the deal was to be structured (i.e., whether the payment would be a straight cash purchase, stock for stock, etc.).↩
30. The parties do not fully explain the method by which Carver-Dodge came to own such an amount. As it is irrelevant for our purposes, we need not pursue the question. ↩
31. The authorized price ceiling was actually $23 million but was to be immediately adjusted downward for a number of factors, including a significant overlift liability of $3.27 million.↩
32. These figures were derived by taking the per-share value times 225 shares. As respondent's redetermined per share value already takes into account whatever discounts he deems appropriate, the listed full values for WOC are less than respondent's estimate of WOC's "intrinsic" (i.e., pre-discount) value. These figures were adjusted on brief. See discussion accompanying footnote 53, infra.↩
33. The Circuit Court in Palmer summarized the parameters of our duty as: The Tax Court does not have to accept "in toto, in part" or at all expert opinion as to value.↩
34. Although in the hands of a donee or beneficiary the shares would still be subject to the restrictions of the agreement, this has no effect on whether it would fix the value for estate tax purposes. Estate of Reynolds v. Commissioner,55 T.C. 172, 188-189↩ (1970).
35. We will address the experts' valuations for both estate and gift tax purposes together.↩
36. "Proved" reserves are those reasonably certain in the near future to be recovered from known oil and gas reservoirs under existing economic and operating conditions. "Proved developed" are proved reserves expected to be recovered through existing wells and equipment methods. They are "producing" if recoverable from existing wells within existing completion intervals and "non-producing" if present below the casing or at greater depths than of existing wells (hence, recoverable within the near future). "Proved undeveloped" are generally those to be recovered from new wells on undrilled acreage.↩
37. Anderson testified that: Nine months before there had been an offer of almost $8 million for that same interest in the Southeast Sumatra concession. So because of the fact that [the ARCO representative] could not recall, he could not find any workpapers as to how those figures were arrived at, I felt that I could no longer give consideration to those--to that $9 million offer in my valuation. ↩
38. Anderson was originally informed that that sale price was approximately $13 million. He arrived at a price of $1 per barrel by multiplying Carver-Dodge's percentage interest in the Sumatra contract (8.66) by the reserve estimates for the region as stated in Natomas' form (156,207,000 barrels), leading to a determination that Hudson's Bay was purchasing a right to 13,527,526 barrels (156,207,000 X .0866) for $13 million, or about $1.00 per barrel.↩
39. We find no independent corroboration as to why the $1.35 per barrel figure was chosen. Apparently it was an approximate midpoint between the $1.75 "estimated" figure for the Shell offer and the $1.00 figure from Carver-Dodge in 1976. We see no evidence supporting such a gradual slide in the price of oil during a period in which, as respondent argues at other times, the price of oil was rising. The actual price of the Carver-Dodge sale ($23 million less Carver-Dodge's overlift) would not support a fluctuating, but rather a consistent price per barrel, using Anderson's methodology. This error underscores the fact that Anderson never sought independent verification of the prices he used. Correspondingly, we think his figures unreliable.↩
40. We attribute to rounding error the difference in Hyzer's total value with what would be the proper mathematical results.↩
41. The $2,706,000 amount was an average of the 1974 and the nonrestated 1975 figures.↩
42. The size of the deferred revenue account also differed because Smith chose a per-barrel price figure for the overlifted oil higher than the figure Steintjes chose. ↩
43. Steintjes, on redirect, drew back from his admission and stated that "there was an argument" for the restated figure. We disagree and think Smith's treatment correct, but only as to this amount. We do not mean to say that we embrace the unaudited restated figures prepared by Steintjes for WOC's 1975 fiscal year or the unchanged 1974 fiscal year as correct. Respondent has illustrated numerous incongruities that occurred over time between WOC's annual figures submitted to respondent and those made available to other parties. (The original 1975 full-year figures, though, correspond to those submitted to the Ex-Im Bank.) Respondent urges that these differences were intentional and solely for the purpose of hiding the true value of WOC's shares. On the basis of the entire record before us we are not willing to go so far as to find such impropriety, nor are we willing to accept as decisive respondent's painstaking and exhaustive recalculations of WOC's entire financials utilizing accounting methods he deems more appropriate for valuation purposes. Our own review of all the figures and corresponding explanations in the testimony lead to the conclusion that any confusion is attributable to WOC, and therefore, petitioners must bear any consequences arising from such confusion whenever applicable. We ultimately find suspect any expert testimony that is dependent upon estimations of value based on WOC's financial report (net income, retained earnings, etc.). See discussion, infra.↩
44. $34,320 X .141 = $4,839 $34,320 - $4,839 = $29,481 ↩
45. $29,481 X 45 = $1,326,645. The value for all of WOC (post discount) would then be $29,481 X 225 shares = $6,633,225. ↩
46. Evans attributed discount percentages to the gift transfers of 10.1 percent for the October 1975 gift, and 10.6 percent for the December 1976 gifts.↩
47. Evans admitted in his report that the number of publicly owner businesses that were, like WOC, not classifiable as fully integrated oil companies or did not have a diversified geographic source of crude, was limited. As we shall see, though, no allowance was made for this factor in his numerical findings.↩
48. The weighted average was compiled by affording a weight of one to the net income of the earliest year (1971), a weight of two to the second year (1972), a weight of three to 1973, and a weight of four to 1974's net income.↩
49. To be fully "integrated" in this context means having the ability to perform all functions in the oil production process. Such functions include lifting the oil, refining, marketing, and delivering to the customer. ↩
50. Evans testified that the most weight should be afforded the return on equity factor. Because WOC's was double that of the next highest company's in the eight he was considering for his evaluation, Evans only chose the three companies with the highest return on equity at the sake of the other factors listed. The result is that Evans' choices were effectively based on return on equity figures alone. In turn, this had the portent of excluding other companies who may have been truly more comparable, while at the same time accepting some that had little comparability to WOC. That explains why Hyzer, who did not limit his list of comparables to return on equity, did not think Tesoro or Offshore were comparable at all.↩
51. Evans offered no reason why Warrior's return on equity was so much higher than the other companies in his sample. A review of the record lends credence to a conclusion that it was due to WOC being thinly capitalized during the period in question.↩
52. This is not to say that Evans did not consider the risks Warrior faced, such as Indonesian expropriation, in choosing his comparables. He did. But among the three companies he chose there was at most, as Evans stated, a "thread of commonality that came through." Evans admitted that "[n]o, [his comparable companies] are not truly comparable, but I tried to weave a thread of comparability through this thing."↩
53. The fair market value of 15 shares of WOC stock for gift tax purposes as of October 15, 1975, was determined by respondent as follows: Adjusted Net Worth Method
$49,735,096
Market Comparison Method
41,666,240
Average of the above two methods
45,700,668
Divided by shares outstanding
225
Appraisal per share
203,114
Value of 15 shares pre-discount
3,046,711
Less: 35% discount
1,066,349
FAIR MARKET VALUE
$ 1,980,362
The fair market value of 30 shares of stock in WOC for gift tax purposes on December 23, 1976, was computed as follows: Adjusted Net Worth Method
$51,276,962
Market Comparison Method
62,728,644
Average of the above two methods
57,002,803
Divided by shares outstanding
225
Appraisal per share
253,346
Value of 30 shares, pre-discount
7,600,380
Less: Thirty-five percent discount
2,660,133
FAIR MARKET VALUE
$ 4,940,247
However, on brief, respondent again changed his valuation figures and requests that we find as fact that the fair market value of the WOC shares is as follows: Number of
Fair Market
WOC value [Fair market value per share ($86,544, $130,763, and $218,875 on each of the respective dates) times 225 shares.]
*
Date
Shares
Value
(post discount)
1/23/75
45
$3,894,480
$19,472,400
10/10/75
15
1,961,445
29,421,675
12/22/76
30
6,566,250
49,246,875
Respondent offers no sufficient justification for asserting values on brief that are, in the case of the gift taxes, in excess of those contained in his amended answer. Moreover, petitioners do not specifically challenge his attempt to do so. We need not examine the propriety of respondent's actions, however, because in any event we reject all of respondent's estimates regarding WOC's value.↩
*. Anderson's value was for WOC's interest in the production sharing contracts, not for shares of stock. The other values are net values. ** These are the figures respondent asserts on brief. See footnote 57, supra.↩
54. Respondent's figures are contradicted also by the amounts of the two offers and the sale price of the like interests. The Shell offer, if extended to both areas, would produce a price $3 million less than respondent's estate tax value. The ARCO offer (which was extended later than the Shell offer), even if viewed for only the Java contract, would not support respondent's $29 million value for the October 15, 1975, valuation date, and the Carver-Dodge sale in April 1976 would be $5 million less than respondent's estate tax value and $15 million and $35 million less than the first and second gift tax dates, respectively.↩
55. From 1973 to 1976, Merkey was the European Oil Representative and Vice President of the London office of First National City Bank (now Citibank). Because of his knowledge regarding Warrior's position and the Indonesian economic market as a whole (the loan to Warrior guaranteed by the WOC principals was from Citibank) WOC retained Merkey to value WOC's shares. This is the first time Merkey has rendered his services as a valuation expert in litigation.↩
56. For the sake of consistency, we will also refer to Nettles' figures and testimony as Stanger's report.↩
57. The parties stipulated that petitioners' exhibit 19 is the expert report prepared by Nettles dated November 27, 1981. Material in appendices attached to the report, however (including the appendix referred to in the text), necessarily was prepared subsequent to that date. Hence, a question arises as to who in fact prepared the numbers appearing in the appendix. We determine from the stipulation and the fact that language appears within the appendix itself stating that its figures were derived from Stanger and Co.'s draft valuation, that the preparation of the appendix is attributable to Nettles.↩
58. The record shows that Steintjes, at least with respect to that ARCO offer, was attempting to prove a value much lower than the various prices.↩
59. The corrected sale price ($19,723,000) divided by 8.66 percent equals $2,277,483. Because we have netted Carver-Dodge's overlift liability from the sale price ceiling of $23 million we need not concern ourselves with what was Warrior's overlift liability on the dates in issue. This is because if we assume that a buyer for Warrior's interest would structure the sale in the same manner, he would offer the "base" price and increase it by Warrior's overlift liability amount. We do not choose to change the value over the three dates because the Shell offer (also expressed in terms of percentage interest, i.e., $2.1 to $2.65 million-per-percentage point) was almost identical to the Carver-Dodge sale, indicating consistency in value over that period. ↩
60. We only evaluate the subsidiary's stock value. The impact on the value of WOC's stock from the additional WOC assets, the value of which the parties have agreed upon, may be determined in the Rule 155 computation.↩
61. Respondent's estimate is based upon the estate↩ tax figure, and thus does not include the ten percent adjustment for the December 22 and 23, 1976, gifts. 62. Respondent considers paying the monthly cash calls for operating costs as "contributions." He thus infers that they should be looked upon as capital.↩